## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| United States of America | : | |
| | : | |
| v. | : | Case No. 3:05cr260 (JBA) |
| | : | |
| William Tisdol | : | |

### RULING ON DEFENDANT'S MOTIONS TO SUPPRESS AND MOTION TO COMPEL DISCLOSURE OF INFORMANTS' IDENTITIES [DOCS. ## 19, 21, 23]

Defendant William Tisdol was arrested on August 3, 2005, and eventually indicted on one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), and one count of possession with intent to distribute 5 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iii), arising out of a search of his apartment pursuant to a search warrant, which uncovered the firearm, and a taxicab stop and search of his person, which uncovered the narcotics.

Defendant now seeks to suppress the seized firearm on the basis that the warrant executed by the officers contained false and stale information, and that without the objectionable information, probable cause would not have existed to issue the warrant, and to suppress the narcotics seized, contending that the taxicab was stopped, and he was searched, without a warrant and in the absence of reasonable suspicion or probable cause. See Motion to Suppress [Doc. # 19]. Defendant also seeks to suppress statements he made subsequent to his arrest on August 3, 2005 as fruits of unlawful searches (both of his person and his

1

apartment) and arrest.  See Supplemental Motion to Suppress [Doc. # 23].  Additionally, defendant moves to compel the disclosure of the identities of the informants referenced in the search warrant affidavit.  He claims that the veracity of the affidavit supporting the search warrant is now in question on the basis of the testimony of one of the confidential informants who has since come forward.  See Motion to Compel [Doc. # 21].

For the reasons that follow, defendant's motions will be denied.

## I.   Factual Background

On August 2, 2005, Hartford Police Department ("HPD") Detectives William Rivera and Richard Medina submitted an affidavit and application for a search warrant for the first floor apartment at 1860 Main Street in Hartford,[1] an alleged residence of defendant, directed at uncovering firearms and ammunition.  See Warrant Application (Def. Hearing Ex. 1).  The warrant affidavit contains 12 paragraphs, which provide, inter alia:

> That Affiant Rivera received information from three independent confidential sources that William "Bub"

---

[1] In defendant's initial briefing, there was discussion of the fact that the warrant listed apartment "A-3," but the officers searched apartment "A-1."  At a pre-hearing conference call on February 15, 2006, and subsequently at the suppression hearing, defense counsel agreed that there is only one apartment on the first floor of 1860 Main Street, and conceded that the misidentification of the apartment number alone is not a valid basis for suppression.

Tisdol is in possession of several firearms including a Mac 10 Assault Rifle and a Tec-9.  The sources stated the following: That Tisdol was released from prison after being acquitted of a Homicide, which he was accused of committing.  That Tisdol shot several people and is known on the street as a "Hit Man."  According to the source, as a result of Tisdol's acquittal, many of the Homicide victims friends are angry and declared that Tisdol will be killed.  That Tisdol is aware of the threats and keeps a firearm in his possession at all times for "Protection."  The sources further stated that Tisdol has "several bodies," the street terminology for "killing several people and getting away with it."  (Paragraph 3)

That on June 21, 2005, the Affiants interviewed an individual placed in custody for a firearm related incident.  The source had intimate knowledge of Tisdol's daily activities and personal life.  That the source stated that He/She was with Tisdol one week earlier at his home smoking marijuana and that Tisdol was in possession of a Tech-9 assault weapon.  That the source stated that Tisdol is nervous and aware that they are trying to kill him.  The source stated that Tisdol resides at 1860 Main Street, in the first floor, with his children's mother.  That the source stated that Tisdol's children's mother['s] . . . nickname was "Lady Bug."  The source further stated that Tisdol operates a red colored Mazda (older model) parked on the south lot of his residence. (Paragraph 4)

That on July 29, 2005, Affiant Rivera and State Inspector Joe Howard interviewed an individual placed in custody for a firearm related incident.  The source stated that He/She was with "Bub" William Tisdol on Sunday, July 25, 2005, and that Tisdol was in possession of a Mac 10 assault rifle.  The source stated that on June 30, 2005, Tisdol robbed an individual of some crack cocaine and the Mac 10.  That Tisdol was in possession of a 9mm black semi-automatic handgun when he committed the robbery.  The source stated that Tisdol is in possession of the Mac 10 and other firearms and that he stores the guns at his home on Main Street.  That source stated that Tisdol lives on Main Street with his children's mother, known to the source as "Lady Bug."  That Tisdol and "Lady Bug" reside on Main Street with 6 of their children.  That Tisdol operates a "beat up" Mazda color red. (Paragraph

9).

Id.  The affidavit also states that upon Detective Rivera's request, defendant had been designated as a firearm risk and target in the Project Safe Neighborhood Program, directed at convicted felons in possession of firearms, that Tisdol was a convicted felon with several firearm-related arrests and had recently been released from prison after being acquitted on a homicide charge, that Rivera had previously had an altercation with Tisdol when attempting to arrest him during which Tisdol was in possession of a firearm, that a HPD Case incident inquiry revealed that defendant resided in the first-floor apartment at 1860 Main Street in Hartford, with his girlfriend Dondi Morell ("Lady Bug"), and that on July 28, 2005, Rivera saw Tisdol standing in front of 1860 Main Street and observed him enter the front door and remain inside.  Id. ¶¶ 2, 5-6, 8.

The warrant application was granted and on August 3, HPD officers, including Detective Rivera and HPD Sergeant Mac Hawkins, went to 1860 Main Street and executed their search warrant on the first floor apartment, seizing a gun.

On the same day, Sergeant Hawkins searched defendant after the HPD officers came to 1860 Main Street to execute their search warrant and observed defendant leaving in a taxicab with his minor daughter.  Hawkins and Rivera testified that when they arrived in the 1860 Main Street area, they parked in a parking

4

lot to the south side of a Church on the opposite side of the
street as 1860 Main Street, and from that vantage point they had
a clear view of the entrance to 1860 Main Street.  Hearing
Transcript ("Tr.") [Docs. ## 57-59] at 45, 316; Gov't Hearing Ex.
2, 4, 6.

Hawkins and Rivera testified that they saw defendant and a
young girl, later identified as his daughter, leave the apartment
and enter a taxicab, which began traveling north on Main Street
and then made a U-turn right in front of them, over a median
which divided the street.  Tr. at 48, 54-55, 324-25, 411-13;
Gov't Hearing Exs. 7, 11.  Defendant himself admitted in a
recorded statement made in connection with his complaint against
Detective Rivera filed with the Internal Affairs Division of the
HPD, that the taxicab driver made the U-turn "right by the
church," over the median.  See Tisdol Interview Transcript [Doc.
# 28, Ex. 4] at 4 ("We get into the cab, pull off from 1860 Main
Street, do a U-turn.  There's a divider right there that people
use all the time, they do a U-turn – . . . It's not an illegal U-
turn right there.  They say it is – . . . Right by the church.
There's a divider though that you can go right over the divider
and –– but it's not an illegal U-turn.  They say in the police
report that it is, but it's not.").  Both Hawkins and the taxicab
driver, Christopher Adams, testified that the median was of low
height in the area in front of the church parking lot, almost at

ground level, such that one could drive a car over it without damaging the car. Tr. at 245-46, 382. However, contrary to the officers' and defendant's testimony, Adams denied making a turn over the median and testified that he turned at the intersection north of defendant's apartment, of Main Street with Mahl/Pavilion Streets.[2]  Tr. at 205-10.

Hawkins and Rivera testified that from their vantage point in the church parking lot, they could not see the intersection to the north of them, of Main and Mahl/Pavilion Streets, because it was obstructed by the Church, but were able to see the U-turn, which they stated took place right in front of them. Tr. 48-49, 391-92; Gov't Hearing Exs. 4-6. Because the nearest intersection was that of Main and Mahl/Pavilion Streets, both Rivera and Hawkins identified that intersection as a reference point, but clarified that the U-turn did not take place at the intersection, but at a location slightly south of the intersection. See Tr. at 53-54; Report of Investigation [Doc. # 54, Ex. B].[3]

---

[2] As one drives north on Main Street from 1860 Main, the first intersection is one with, to the east, Pavilion Street, and to the west, Mahl Street (which turns into F.D. Oates Avenue). See Gov't Hearing Ex. 7.

[3] Defendant offers as impeachment of Hawkins' testimony regarding the location of the U-turn Hawkins' grand jury testimony that "[w]e observed the cab travel north on Main Street. And when it got to the first intersection, which is Main and Pavilion, it did an illegal U-turn, and went south on Main Street, at which time we decided to conduct a motor vehicle stop." Hawkins Grand Jury Testimony [Doc. # 54, Ex. A]. However, as noted above, Rivera's testimony and an HPD "Report of

Rivera and Hawkins subsequently directed patrol officers to stop the taxicab, which the officers eventually did after the cab had made a right turn on Mather Street, which intersects with Main Street south of the church parking lot and defendant's apartment.  After approaching the stopped taxicab, and ordering its occupants out of the car, Hawkins proceeded to frisk defendant for weapons.  Tr. at 330.  Rivera and Hawkins testified that defendant was "high risk" and had "a history of guns," and they thus wanted to frisk him for officer safety.  Id. at 75, 327, 330.  During his frisk of defendant, Hawkins "felt a hard rock-like substance in his pocket, which to [Hawkins] in [his] 16 years of experience is [sic] crack cocaine."  Tr. at 326; accord id. at 332-39.  Hawkins removed the object from Tisdol's pants pocket, and "it was in a plastic bag.  There were several rock-like substances.  Immediately to [him] [he] knew it was crack cocaine."  Id. at 336.

Tisdol was subsequently arrested and transported to the police station where Detective Rivera and Detective Dennis Sikoski conducted an interview.  Tr. at 340.  Rivera and Sikoski testified that defendant was read his Miranda rights and shown a

---

Investigation" clarify that the officers were only using the intersection as a reference point and, further, the testimony of the taxicab driver that he made the turn at the intersection is discredited by the officers' testimony, the testimony of defendant himself, and by the photographs and testimony indicating that the officers would not have been able to see a U-turn executed at the intersection.

waiver form, <u>id</u>. at 519-25, 532-33, 610-11, 625, and that defendant was willing to talk but refused to sign the form, <u>id</u>. at 534, 611, which is not unusual, <u>id</u>. at 567-68, 616.  The detectives testified that defendant understood his rights as read to him and did not ask for any clarification.  <u>Id</u>. at 567, 576, 611.  During the course of the interview, Tisdol admitted robbing another individual of a Mac-10, being in possession of at least one firearm, and after making these admissions stated to the detectives: "[y]ou got what you wanted, you got a confession." Def. Hearing Ex. 2 (police report); Tr. at 534-35, 538-41, 572.

Defendant now seeks to suppress the firearm and narcotics seized, as well as his confessions, arguing that the search warrant is invalid under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), that the stop of the taxicab and frisk of his person was not supported by reasonable suspicion as required under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), and that his incriminating statements should be suppressed as fruits of unlawful searches (both of his person and his apartment) and arrest pursuant to <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963).

## II.  DISCUSSION

### B.  Search of Apartment/<u>Franks</u> Challenge to Warrant

"A defendant is permitted to challenge the veracity of a search warrant in limited circumstances.  One such circumstance is where the affidavit in support of the search warrant is

8

alleged to contain deliberately or recklessly false or misleading information." United States v. Canfield, 212 F.3d 713, 717 (2d Cir. 2000) (citing Franks v. Delaware, 438 U.S. 154, 164-72 (1978)). "To suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding." Id. at 717-18.

On the basis of an affidavit submitted with defendant's suppression motion by the source identified in paragraph 9 of the search warrant affidavit – Isaiah Griffin – and Griffin's testimony at the hearing, defendant argues there is sufficient evidence that Detective Rivera included the information in paragraph 9 deliberately, knowing it was false or, at the very least, included the information with reckless disregard for its truth.  Defendant also contends that the falsity of paragraph 9 calls into doubt the veracity of information alleged to have been reported by two other confidential sources, identified in paragraphs three and four.

Paragraph 9 provides:

That on July 29, 2005, Affiant Rivera and State Inspector Joe Howard interviewed an individual placed in custody for a firearm related incident.  The source stated that He/She was with "Bub" William Tisdol on Sunday, July 25, 2005, and that Tisdol was in possession of a Mac 10 assault rifle.  The source stated that on June 30, 2005, Tisdol robbed an

individual of some crack cocaine and the Mac 10.  That
Tisdol was in possession of a 9mm black semi-automatic
handgun when he committed the robbery.  The source stated
that Tisdol is in possession of the Mac 10 and other
firearms and that he stores the guns at his home on Main
Street.  That source stated that Tisdol lives on Main Street
with his children's mother, known to the source as "Lady
Bug."  That Tisdol and "Lady Bug" reside on Main Street with
6 of their children.  That Tisdol operates a "beat up" Mazda
color red.

Warrant Application ¶ 9.  In his affidavit, Griffin states, <u>inter
alia</u>, that he told Detective Rivera that he knew Tisdol ("Bub"),
that "Det Rivera . . . says that he heard Bub was dangerous and
would shoot a cop.  Det Rivera is trying to get me to agree to
that," that "Det Rivera [told] [him] a story about a robbery
where some crack and a Mac 10 assault rifle and that Bub was the
perpetrator and that if [he] agreed [Rivera] would seek some
lenience on [his] sentence, so [he] agreed," and that Griffin
also told Rivera "that [he] was with Bub on July 25th and at the
time Bub [(Tisdol)] was in possession of that Mac 10." Def.
Hearing Ex. 6.  Griffin then asserts that he wants to "set the
record straight," that he did not see "Bub" with a Mac 10 and was
not with him on July 25, 2005, nor did he have any discussion
with him "about a robbery or any guns.  This was all a lie
devised by Det William Rivera that would help him in his words
'gain a trophy'".  <u>Id</u>.

Similarly, at the suppression hearing Griffin testified that
Rivera had asked him "about a robbery that supposedly took place,
and [he] agreed to it," Tr. at 96, he agreed "that Tisdol had

robbed somebody of some crack cocaine and a Mac-10," id. at 102-03, and he "agreed that Mr. Tisdol was in possession of a Mac-10 and other firearms," id. at 105, but that he was lying, see id. at 100-01, 103, 105, 152-53.  Griffin also stated that he never told Rivera where Tisdol lived and in fact did not know that Tisdol lived on Main Street.  See id. at 104, 106-07, 147-48. When asked to explain his lies, Griffin claimed that Rivera is "too underhanded," id. at 99, and that Griffin told Rivera what he did because Rivera "le[d] [Griffin] to believe, you know, that Mr. Tisdol, you know, said something about [Griffin], . .. gave [Griffin] up," id. at 101-02, 152-53.

By contrast, both Rivera and Inspector Howard, who sat in on the interview, testified that Griffin "gave [them] the information," id. at 475-77, 303-04 (Rivera did not put words into Griffin's mouth), and both also stated that Griffin told them that Tisdol lived on Main Street, id. at 196, 301-02, 458. Rivera specifically testified that Griffin "told [him] that Mr. Tisdol was storing a Mac-10 and other firearms at the home" and that Griffin knew this from speaking with Tisdol about it.  Id. at 500-02, 514-15, 558.  Rivera also contradicted Griffin's claim that he told Griffin he would seek lenience if Griffin provided information about Tisdol, and denied saying that Tisdol was a "trophy."  Id. at 473-75.  Both Rivera and Howard denied coercing, threatening, or putting any pressure on Griffin to

11

provide incriminating information about Tisdol.  Id. at 303-04,
565-66.

This evidence does not provide a basis for concluding that
Rivera either deliberately included false information in his
affidavit at paragraph 9, or that he included that information
with reckless disregard for its truth.  As a preliminary matter,
the Court is not convinced that Griffin was credible in his
affidavit and at the hearing when he denied the truth of his
statements to Detective Rivera, as the evidence shows that
Griffin provided the affidavit only after he spent time with
defendant in prison, id. at 119-22, and although he denied that
defendant asked him (or threatened him) to fill out an internal
affairs form or give the affidavit, id. at 124, 129, Griffin's
explanation of his decision to sua sponte provide a statement to
the internal affairs department, have it notarized, and send a
copy to Tisdol's lawyer, is less than plausible, see id. at 129-
33 (Griffin could not remember how he knew who Tisdol's lawyer
was or how he determined the lawyer's address).  Additionally,
apart from the contradictory evidence as to whether Griffin told
Rivera that Tisdol resided on Main Street, neither Griffin's
affidavit nor his testimony actually indicate that Rivera and/or
Howard had reason to believe or suspect that Griffin was lying
because Griffin admitted that, at the very least, he "agreed to"
all of the information appearing in paragraph 9 of the affidavit

(apart from the information about defendant's residence).  See
id. at 105, 114, 150-51.  Further, Rivera reasonably assumed that
Griffin was in a position to know the information he provided
because Griffin was at least an acquaintance of Tisdol and,
moreover, much of the information Griffin provided (other than
Griffin's specific alleged interaction with defendant on July 25,
2005) was corroborated by other information Rivera already had,
including that Tisdol lived on Main Street.  See id. at 175-76,
185-86, 196, 458, 489, 555-56.

Moreover, even if Tisdol were able to satisfy the first
prong of the Franks test, he cannot satisfy the second because
probable cause to grant the search warrant would have been
demonstrated even excising paragraph nine from the warrant
affidavit as the information in paragraphs 2 and 5 established
that Tisdol was a dangerous felon with several firearm-related
arrests, the information in paragraphs 3 and 4 showed that Tisdol
was in possession of several firearms, and the information in
paragraphs 4 and 6 (the latter from an HPD database) demonstrated
that Tisdol resided at 1860 Main Street, which was further
corroborated by the information in paragraph 8 that Rivera set up
surveillance on Tisdol and observed him enter 1860 Main Street on
July 28, 2005 and remain inside.

As to the information in paragraph 4, defendant argues that
it is "stale" as it was provided by a source interviewed on June

13

21, 2005.  The general principle is that "the facts in an
affidavit supporting a search warrant must be sufficiently close
in time to the issuance of the warrant and the subsequent search
so that probable cause can be said to exist as of the time of the
search and not simply as of some time in the past."  United
States v. Wagner, 989 F.2d 69, 75 (2d Cir. 1993) (citing Sgro v.
United States, 287 U.S. 206 (1932)).  "In the Second Circuit, the
principal factors in assessing whether or not the supporting
facts have become stale are the age of those facts and the nature
of the conduct alleged to have violated the law."  Diamondstone
v. Macaluso, 148 F.3d 113, 124 (2d Cir. 1998) (internal citation
omitted).  Thus, "[w]here the supporting affidavits present a
picture of continuing conduct or ongoing activity, as contrasted
with isolated instances of illegal acts, the passage of time
between the last described act and the presentation of the
application becomes less significant."  Rivera v. United States,
928 F.2d 592, 602 (2d Cir. 1991) (internal citation omitted).
"The overall approach should be one of flexibility and common
sense."  United States v. Beltempo, 675 F.2d 472, 478 (2d Cir.
1982).

Here, the information provided by the source in paragraph 4
on June 21, 2005 (six weeks before the warrant application and
search of defendant's apartment) concerned where defendant lived,
that defendant was in possession of a gun when the source visited

14

defendant at his apartment, and that defendant was nervous and
aware that people were trying to kill him.  This information thus
provides allegations of criminal conduct (that is, possession of
a firearm) that is continuing – because a gun is an item which
one would be expected to remain in possession of for an extended
period of time, see, e.g., United States v. Grubb, 83 F.3d 434
(10th Cir. 1996), and because defendant's claimed need for the
gun would presumably not dissipate quickly, i.e. possession for
self defense in the face of ongoing threat.[4]  The information
provides a nexus between defendant's possession of a gun and
defendant's apartment, as the source states that defendant had
the gun at his apartment, and because guns can be presumed to be
kept in an individual's home, particularly when intended for
personal self defense purposes.  See United States v. Jones, 994
F.2d 1051, 1056 (3d Cir. 1993) ("[I]t is reasonable to assume
that people keep guns in their homes.").

Thus, the paragraph four information is not stale, and can
be included in the probable cause analysis.  This information,

---

[4] The nature of this continuing activity can also be
compared to United States v. Webb, 255 F.3d 890 (D.C. Cir. 2001),
in which 109 days passed between the last controlled drug
transaction between the defendant and an informant, but the Court
concluded that the information was not stale, reasoning "even if
Webb did not have drugs in his apartment at the time of the
[warrant] application, it would not necessarily have been
unreasonable for an officer to conclude that a longtime drug
dealer, whose most recent known deal had occurred three months
earlier, would still retain papers permitting him to get back in
touch with his customers or . . . his supplier." 255 F.3d at 905.

combined with the other warrant application information detailed above, excluding paragraph 9, was "sufficient . . . to warrant a [person] of reasonable caution in the belief" that defendant was illegally in possession of a firearm (or multiple firearms), being stored at his apartment at 1860 Main Street.  See Brinegar v. United States, 338 U.S. 160, 175-76 (1979).

Accordingly, defendant cannot satisfy either prong of the Franks analysis and his motion to suppress the gun seized based on claimed invalidity of the warrant must be denied.

**B.   Stop and Search of Defendant**

"[A]n ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth and Fourteenth Amendments [and] [a]ccordingly, such stops must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct."  United States v. Scopo, 19 F.3d 777, 781 (2d Cir. 1994).[5]  Additionally, "a police officer who observes a traffic violation may stop a car without regard to what a 'reasonable officer' would do under the circumstances and without

---

[5] See also Whren v. United States, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); Delaware v. Prouse, 440 U.S. 648, 663 (1979) ("Accordingly, we hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile . . . [is] unreasonable under the Fourth Amendment.").

regard to the officer's own subjective intent.  In other words, an officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance."  United States v. Dhinsa, 171 F.3d 721, 724-25 (2d Cir. 1998) (citing Whren, 517 U.S. at 813, 815-19).  Under Maryland v. Wilson, 519 U.S. 408 (1997), and Pennsylvania v. Mimms, 434 U.S. 106 (1977), after lawfully stopping a car, a police officer may "as a matter of course" order the driver and passengers to exit the vehicle.

In this case, the Government claims that the officers observed the taxicab make an illegal U-turn, justifying a stop of the car and an order that defendant, the driver, and defendant's minor daughter exit the vehicle.  Neither statute to which the Government refers actually prohibits certain U-turns as the Government claims,[6] however, Conn. Gen. Stat. § 14-237 provides:

---

[6] Conn. Gen. Stat. § 14-241 regards the appropriate procedures for taking turns, including which lane a driver should be in prior to taking a turn, but does not mention U-turns; Conn. Gen. Stat. § 14-242(d) provides:
> No person shall turn a vehicle so as to proceed in the opposite direction upon any curve, or upon the approach to, or near the crest of, a grade, where such vehicle cannot be seen by the driver of any other vehicle approaching from either direction within five hundred feet, or at any location where signs prohibiting U-turns are posted by any traffic authority.

The Government does not appear to argue that the taxicab could not be seen by the driver of another vehicle approaching from either direction within five hundred feet and has not sought to rebut defendant's contention (supported by photographs of Main Street) that there are no signs prohibiting U-turns, see Def. Ex. D.

> When any highway has been divided into two roadways by
> leaving an intervening space or by a physical barrier
> or clearly indicated dividing section, each vehicle
> shall be driven only upon the right-hand roadway and no
> vehicle shall be driven over or across any such
> dividing space, barrier or section, except through an
> opening or at a crossover or intersection established
> by public authority.  Violation of any provision of
> this section shall be an infraction.

Main Street constitutes a "highway," which is defined as "any state or other public highway, road, street, avenue, alley, driveway, parkway or place, under the control of the state or any political subdivision of the state, dedicated, appropriated or opened to public travel or other use."  Conn. Gen. Stat. § 14-1(37).  The photographs of Main Street show that there was a physical barrier between the south and north roadways (a cement median bordered by curbs and yellow lines), such that it would constitute an infraction to drive over/across that barrier in making a U-turn.  See, e.g., Def. Hearing Exs. 3-5; Gov't Hearing Exs. 7, 9, 11-12.[7]

As detailed supra in Pt. I, the testimony of the taxicab driver, Christopher Adams, that he made the U-turn at the intersection of Main and Mahl/Pavilion Streets is contradicted by the testimony of Rivera and Hawkins that Adams made the turn right in front of them (parked in the church parking lot), over the median.  Even Adams admitted that the median was lower in

---

[7] Adams agreed that driving over the Main Street median would be illegal.  See Tr. at 237.

front of the church, almost level with the ground, such that it would be possible to make a turn there without damaging one's car and, moreover, Adams' testimony that he made the U-turn at the intersection is undercut by the officers' testimony that they were able to see the U-turn but that they would not have been able to see a turn at the intersection because their view was obscured.  Additionally, while defendant claims that Adams has no incentive to fabricate his testimony, his credibility could be questioned in two ways: first, as a taxicab driver his record would be negatively impacted if it were established that he committed a traffic infraction, and second, he had a friendly relationship with defendant.  Moreover, defendant's own statements corroborate the officers' description of the U-turn. Accordingly, the evidence shows that the officers lawfully stopped the taxicab for a traffic violation, see Dhinsa, 171 F.3d at 724, and, having stopped the car, acted legally in ordering defendant, his daughter, and Adams out of the car, Wilson, 519 U.S. 408; Mimms, 434 U.S. 106.[8]

_____

[8] That Rivera and Hawkins testified that once they saw defendant exit 1860 Main Street and get into the taxicab, they decided they would stop him, seemingly irregardless of the commission of any traffic infraction, is irrelevant to the determination because "[w]hether probable cause or reasonable suspicion exists is an objective inquiry; the actual motivations of the individual officers involved in the stop play no role in the analysis."  See Holeman v. City of New London, 425 F.3d 184, 190 (2d Cir. 2005); Dhinsa, 171 F.3d at 724 ("[A] police officer who observes a traffic violation may stop a car without regard to what a 'reasonable officer' would do under the circumstances and

Thus, because the stop of the taxicab was reasonable, Sergeant Hawkins was justified in conducting a frisk of defendant for weapons for his protection so long as he had reason to believe that defendant was armed and dangerous (regardless of whether there was probable cause to arrest the defendant for a crime).  See United States v. Casado, 303 F.3d 440, 444 (2d Cir. 2002) (citing Terry v. Ohio, 392 U.S. 1 (1968)).  The Supreme Court in Terry "held that a search must meet two requirements to fall within this 'narrowly drawn authority.'  First, it cannot be motivated solely by a 'hunch' that an individual is armed and dangerous.  There must instead be a suspicion supported by 'specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience.'  Second, the weapons search must be 'confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."  Casado, 303 F.3d at 444 (citing Terry, 392 U.S. at 29).

---

without regard to the officer's own subjective intent.").
Additionally, contrary to defendant's contention, the patrol officers who actually conducted the stop of the taxicab had reasonable suspicion to do so, even though they did not witness the illegal U-turn observed by Rivera and Hawkins, on the basis of the collective knowledge doctrine.  See Savino v. City of N.Y., 331 F.3d 63, 74 (2d Cir. 2003) ("The collective knowledge doctrine provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all.") (internal citation omitted).

Here, it was reasonable for Sergeant Hawkins to suspect that defendant was armed and dangerous and to fear for his and his fellow officers' safety based on the informant information the officers had obtained, the fact that a warrant had been issued to search defendant's residence for firearms, the fact that defendant had prior arrests for firearm offenses, and the fact that defendant had previously engaged in a physical struggle with Detective Rivera while in possession of a firearm.  Hawkins testified that he considered the stop to be "high-risk," and the purpose of the frisk was for "officer safety," to look for weapons.  Tr. at 327, 330.

However, in order for the seized narcotics to be admissible, the search must also have been "limited in scope to [a] protective purpose."  McCardle v. Haddad, 131 F.3d 43, 48 (2d Cir. 1997) (citing Adams v. Williams, 407 U.S. 143, 146 (1972)).  Nevertheless, "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context."  Minnesota v. Dickerson, 508 U.S. 366, 375-76 (1993).  Circuit courts have

termed the holding in <u>Dickerson</u> the "plain feel" rule, and have
held that where, in conducting a protective frisk, an officer
feels something and, based on his or her experience, immediately
believes the object to be narcotics, "the pat-down gives them
probable cause to search the suspect for drugs."[9] <u>United States
v. Salazar</u>, 945 F.2d 47, 51 (2d Cir. 1991) (pat-down resulted in
officer feeling "crackling plastic, which betrayed the presence
of crack vials"); <u>see also</u> <u>United States v. Raymond</u>, 152 F.3d
309, 312-13 (4th Cir. 1998) (officer did not exceed the scope of
a <u>Terry</u> frisk conducted after traffic stop where "after
determining that the object was not a gun, [he] immediately
realized from the shape of the object and his experience on the
force that it was a crack cookie"); <u>United States v. Proctor</u>, 148
F.3d 39, 42-43 (1st Cir. 1998) (seizure of "glassine bag of
marijuana" from defendant's jacket fell within the scope of the
plain-feel doctrine where officer testified that "he was

---

[9]   Judge Lynch in the Southern District of New York
characterized the distinction between permissible frisks and
searches beyond the protective scope as follows: "[T]he line is
between an officer's discovery during a pat-down frisk of
contraband whose 'contour or mass makes its identity immediately
apparent,' and an officer's engaging in a tactile search by a
process of investigatory manipulation to determine the identity
of an object already determined not be a weapon." <u>United States
v. Ramirez</u>, 02cr1228 (GEL), 2003 WL 260572, at *7 (S.D.N.Y. Feb.
5, 2003) (citing <u>Dickerson</u>, 508 U.S. at 375) (also noting that
<u>Terry</u> and <u>Dickerson</u> "must contemplate the permissibility of some
form of 'tactile exploration' of an object encountered during a
frisk. . . . Otherwise, how could an officer ever appreciate the
'contour and mass' of such an object in order that its identity
could become 'apparent'?").

consistently able to determine the feel of marijuana from conducting numerous pat-downs of suspects").

This case mirrors Salazar, Raymond, and Proctor. Here, the incident report of defendant's arrest notes "Sgt. Hawkins conducted a pat down on Accused Tisdol for officers safety.  That in the front left pocket, Sgt. Hawkins immediately felt a round bulge.  That through his training and experience, Sgt. Hawkins was fully aware that narcotics is packaged in such a form and immediately recognized it as such."  Def. Ex. E at 2.  Hawkins' hearing testimony corroborated these statements, confirming he had both experience and specialized training in detection and identification of narcotics, Tr. at 398-401, he conducted a pat-down for officer safety with an open hand on the outside of defendant's clothing, id. at 326, 329-30, and during the pat-down he felt in one of defendant's front pants pockets several hard, rock-liked substances, which were "immediately recognizable to [him] as narcotics," id. at 332-36.  Hawkins then "pulled the contraband out," and "it was in a plastic bag.  There were several rock-like substances [and] immediately to [him] [he] knew it was crack cocaine."  Id. at 336-40.  Hawkins' search of defendant thus did not go beyond a pat-down for weapons, and did not continue after determining defendant was not armed; rather, Hawkins felt hard rock-liked substances that he immediately recognized, from his training and experience, to be narcotics,

and at that point probable cause existed to seize the narcotics and search defendant for related contraband.  See Salazar, 945 F.2d at 51.

Accordingly, the stop of the taxicab was lawful, as was ordering defendant and the other occupants out of the vehicle, and the frisk of defendant uncovering narcotics did not exceed the permissible scope of a justified pat-down for officer safety. Defendant's motion as to the narcotics will thus be denied.

### C.   Defendant's Statements

Wong Sun v. United States, 371 U.S. 471 (1963), and its progeny provide that where defendant is unlawfully searched, seized, or arrested, any subsequent confession must be suppressed unless shown that the "confession was 'an act of free will [sufficient] to purge the primary taint of the unlawful invasion." Kaup v. Tex., 538 U.S. 626, 632-33 (2003) (citing Wong Sun, 371 U.S. at 486).  In this case, however, as detailed above, the Court rejects defendant's arguments that the search of his apartment and the stop and frisk of his person were unlawful or unjustified.  Further, there is nothing in the record suggesting that defendant was not advised of or did not understand his rights (indeed all testimony is to the contrary, see Tr. at 519-25, 532-33, 567, 576, 610-11, 625), or that his confessions were otherwise involuntary or coerced (in fact, see Tr. at 534, 611 (Tisdol was willing to talk to the detectives)).

24

Accordingly, the Supplemental Motion to Suppress Defendant's Statements [Doc. # 23] is also denied.

### D.    Motion to Compel

The Supreme Court in Roviaro v. United States, 353 U.S. 53, 60-61 (1957), acknowledged that "[w]here the disclosure of an informer's identity, or the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.  Roviaro calls "for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense.  Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."  Id. at 62. "[D]efendant bears the burden of showing the need for disclosure of an informant's identity [and] [s]peculation that disclosure of the informant's identity will be of assistance is not sufficient to meet [this] burden; instead, the district court must be satisfied, after balancing the competing interests of the government and the defense, that the defendant's need for disclosure outweigh's the government's interest in shielding the informant's identity."  United States v. Fields, 113 F.3d 313,

25

324 (2d Cir. 1997).

As a preliminary matter, defendant's motion as to the sources in paragraphs 4 and 9 of the search warrant affidavit are moot, as the identities of those individuals have already been disclosed (paragraph 4's inadvertently through Detective Rivera's testimony and paragraph 9's by Isaiah Griffin's affidavit and testimony).  As to the confidential source listed in paragraph 3, defendant has not demonstrated the need for disclosure of the identity of this individual because, as detailed above, Griffin's testimony does not implicate the veracity or credibility of Detective Rivera or, accordingly, his characterization of the information provided by the source.  Accordingly, defendant's Motion to Compel [Doc. # 21] will be denied.

**III. CONCLUSION**

For the foregoing reasons, defendants' suppression motions [Docs. ## 19, 23] are DENIED.  Defendant's Motion to Compel [Doc. # 21] is also DENIED.

_____IT IS SO ORDERED.


                              _____/s/_____
                              Janet Bond Arterton
                              United States District Judge

**Dated at New Haven, Connecticut this 30th day of August, 2006.**